MARY C. McDONALD et al., Appellees, v. COE STONE et al., Appellants. —321 S. W. (2d) 845.

Western Section.    August 27, 1958.

Certiorari denied by Supreme Court January 23, 1959.

John Heiskell, Memphis, for appellants.

Burch, Porter, Johnson & Brown, Memphis, for appellees.

CARNEY, J.  The appellee, Mrs. Mary C. McDonald, brought an original bill of ejectment in the Chancery Court of Shelby County seeking possession of a lot or parcel of land, for compensatory and punitive damages, and the removal of a cloud on complainant's title. The cause was tried to a jury upon demand of Mrs. McDonald.

The Chancellor found that Mrs. McDonald had title to the lot and was entitled to possession. He submitted to the jury only the issues of compensatory and punitive damages. The jury entered an award of $6,000 for compensatory damages and $7,000 for punitive damages.

Treating the jury's verdict as advisory the Chancellor, on a motion for a new trial, reduced the compensatory damages from $6,000 to $3,413.75 and suggested a remittitur of the remainder of $2,586.25.

The Chancellor accepted the jury's verdict on punitive damages and awarded the appellee the sum of $7,000 punitive damages as found by the jury.

The defendants below, Harry Bloomfield, Coe Stone and Highland Plaza, Inc., have not appealed from the award of compensatory damages but have appealed and assigned error to the action of the Chancellor in awarding $7,000 as punitive damages.

The complainant, Mrs. Mary C. McDonald, accepted the remittitur under protest and has appealed and assigned error to the action of the Chancellor in reducing the award of the jury from $6,000 to $3,413.75 as compensatory damages.

### Assignment of Errors of Appellants, Coe Stone, Harry Bloomfield, and Highland Plaza, Inc.

These appellants insist that the court was in error in submitting the issue of punitive damages to the jury and in awarding punitive damages to the appellee in the case for the following reasons: (1) There is no fraud or wilful wrongdoing shown; (2) possession was not obtained by appellants' vi et armis; (3) appellants acted at all times on the advice of legal counsel; (4) during most of the period of time that appellants were in possession of appellee's property, appellants, through their attorney, were negotiating with appellee and other owners to purchase the property; (5) the punitive damages, as allowed, are so grossly excessive as to shock the conscience of the court.

The real estate involved in this controversy was originally a part of a three-acre tract of land owned by William Covington at the time of his death in 1910. Mr. Covington was the father of the present complainant, Mrs. Mary C. McDonald. The three-acre tract of land is located in Memphis, Tennessee, and bounded on the north by Poplar Boulevard which runs generally east and west, bounded on the west by Reece Street (formerly White Street), bounded on the south in part by property owned by the Sunshine Home for Aged Men and bounded on the east by property of the Sunshine Home for Aged Men.

In 1928 the four surviving children and next of kin of William Covington, deceased, partitioned the three-acre tract of land into four lots with each child receiving a lot under the terms of a partition deed executed by them of date July 7, 1928, and duly recorded in the Register's office of Shelby County. Each of said lots fronted on Poplar Boulevard and extended southward across the entire width of the Covington property.

Lot No. 1 fronted 77.1 feet on Poplar and 444.9 feet on Reece Street and was allotted in fee simple to a daughter of Mr. Covington, Mrs. Pearl Dick.

Lot No. 2 was immediately east of Lot No. 1 and fronted 77.1 feet on Poplar and was allotted to another daughter, Mrs. Sally Mahon. The east line of Lot No. 1 was the west line of Lot No. 2.

Lot No. 3 fronted 77.1 feet on Poplar and was immediately east of Lot No. 2 and was allotted to the present complainant, Mrs. Mary C. McDonald. The east line of Lot No. 2 was the west line of Lot No. 3.

Lot No. 4 was immediately east of Lot No. 3, fronted 66.4 feet on Poplar and was allotted to Albert Covington, a son of William Covington. The east line of Lot No. 3 was the west line of Lot No. 4. Lot No. 4 is not involved in this controversy and will not be referred to further. It is now owned by the Sunshine Home for Aged Men.

In 1928 the three sisters, Mrs. Dick, Mrs. Mahon, and Mrs. McDonald, deeded to their half-brother, Fred G. Wilson, the south 60 feet of Lots 1, 2, and 3. Fred G. Wilson had not inherited any property from his step-father, William Covington, and the sisters deeded this lot to him as an expression of their affection for him.

The lot so conveyed to Fred G. Wilson was rectangular, being 60 feet by 223.8 feet, fronted 60 feet on the east side of White Street or Reece Street and extended eastward a total of 223.8 feet to the original east line of Lot No. 3 which was also the west line of Lot No. 4.

The south line of the Wilson lot was the south line of the original three-acre tract. After the conveyance to Wilson the north line of his lot was comprised of the new south lines of Lots 1, 2, and 3 each being 74.6 feet wide. This Wilson lot, size 60 feet by 223.8 feet, is the lot in controversy and the subject of this litigation.

The dwelling house of William Covington was located on Lot No. 3 which was partitioned to the complainant, Mrs. Mary C. McDonald and she continued to live in said home for many years after the death of her father and after Lot No. 3 was allotted to her.

On March 28, 1934, Fred G. Wilson died intestate and without children. By operation of law the title to his lot devolved upon his heirs who were the four Covington children, to wit, Pearl Covington Dick, Sally Covington Mahon, Mary Covington McDonald, and Albert W. Covington and one M. L. Wilson a half-brother of Fred G. Wilson but no relation to the four surviving children of William Covington. Accordingly, each of these parties including the complainant, Mrs. Mary C. McDonald, inherited an undivided one-fifth interest each in said Wilson lot.

Shortly after the death of Fred G. Wilson four of his five heirs, to wit, Mrs. Dick, Mrs. Mahon, Albert Covington and M. L. Wilson, verbally gave their interest in the Wilson lot to the complainant, Mrs. McDonald. At this time there were taxes accrued against the lot since 1928

which she paid, Mrs. McDonald also paid the taxes on said lot as the owner by inheritance and under the verbal gift above mentioned continuously from 1934 to the date of the trial.

It will be remembered that the eastern one-third of the Wilson lot was immediately south of Lot No. 3 which was owned by Mrs. McDonald. There were no dwelling houses or buildings on the Wilson lot except for a time Mrs. McDonald had the property fenced in for chickens and possibly there was a chicken house on the Wilson lot.

As Memphis grew in population land values rose very rapidly.

Sometime prior to 1955 Mrs. McDonald sold Lot No. 3 to one Ryan who in turn sold the lot to the defendant, Coe Stone and one Miss Lowrance. Shortly thereafter the defendant, Harry Bloomfield, purchased the interest of Miss Lowrance in the lot and he and the defendant, Stone, then conveyed the Lot No. 3 to a building corporation known as the defendant, Highland Plaza, Inc.

The defendants, Stone and Bloomfield, are the principal owners of the Highland Plaza, Inc. Said defendants, Stone and Bloomfield, individually and as officials of the Highland Plaza, Inc., proceeded to erect a large office building on Lot No. 3 which fronted 77.1 feet on Poplar Boulevard. The defendants, Stone and Bloomfield, were under the erroneous impression that under their deed this Lot No. 3 extended all the way south to the south line of the original Covington tract and thus included the Eastern one-third of the Wilson lot which had been carved from the south ends of Lots 1, 2, and 3.

Sometime after their purchase and after construction had begun on the office building the defendants, Stone

and Bloomfield, learned that they did not own the south 60 feet of the original Lot No. 3. The testimony is in conflict as to just when they learned that they did not own the lot and as to just when they learned that the complainant, Mrs. Mary McDonald, did own the lot or have an interest therein.

At any rate after learning that they did not own the south 60 feet of the original Lot No. 3 they instructed their real estate agents and/or attorneys to locate the true owners of the lot and try to lease or purchase the same if possible. Meanwhile during the course of construction of the office building they took possession, not only of the eastern one-third of the Wilson lot but also the other two-thirds of the Wilson lot. They not only stored materials from the dismantling of the original Covington dwelling house but also stored new materials, trucks and equipment used in connection with the construction of the new office buildings. They took possession of the entire Wilson lot and obtained access to and from the south end of Lot No. 3 from Reece Street across the entire length of the Wilson lot.

After the office building was completed they paved with blacktop the eastern one-third of the Wilson lot and gravelled other portions of the same and used the entire lot both for parking and also as a means of access to a parking lot leased by Highland Plaza, Inc., from the Sunshine Home for Aged Men located immediately south of the Wilson lot.

During the course of construction of the office building and subsequent thereto Mrs. McDonald protested against the use and occupancy of her lot to which the defendants replied on more than one occasion that if she would pro-

duce a satisfactory title to the lot they would lease it or buy it.

During this time the complainant's sister, Mrs. Pearl Dick, still owned Lot No. 1 in the Covington sub-division and complainant's sister, Mrs. Mahon, continued to own Lot No. 2 of the Covington sub-division. Attorneys for Stone and Bloomfield, after learning that the record title to the land was still in Fred G. Wilson, set about to learn his heirs and began negotiating with Mrs. Mahon and Mrs. Dick for the purchase of their interest, if any, in said Wilson lot.

As a result of these negotiations and as a result of the fact that the value of the land in the neighborhood had greatly enhanced since 1934 Mrs. Mahon and Albert Covington repudiated their verbal gifts of their respective interests in the Wilson lot to Mrs. McDonald and Mrs. McDonald paid each of them $2,500 for a deed. The other heirs, namely, Mrs. Dick and M. L. Wilson, did not repudiate their verbal gift and signed a deed to the lot without requiring Mrs. McDonald to pay them anything. This deed was dated April 24, 1956, and recorded in the Register's office of Shelby County, on January 11, 1957. Each of the cotenants assigned their claims for damages against the defendants to Mrs. McDonald.

In May, 1956, the defendants, Stone and Bloomfield, who had not been able to obtain a deed or lease from any owner of the property obtained a quitclaim deed to the said Wilson lot describing it by metes and bounds from Bess Thornley who was secretary to the defendant, Harry Bloomfield. Admittedly, the grantor Thornley had never had any interest in said lot and claimed no interest

in said lot. The purpose of this deed according to defendant's testimony was to bring the matter out in the open and possibly get the title to the lot in court, thus enabling them ultimately to purchase or lease the lot.

On September 12, 1957, the defendant, Harry Bloomfield, executed and had recorded another quitclaim deed to said Wilson lot purporting to convey it from him to the original owner, Fred G. Wilson, who had died in 1934. This deed by Bloomfield was executed within a few days after Mrs. McDonald had visited the office of Mr. Bloomfield and questioned Miss Thornley about the execution of the quitclaim deed from her to Bloomfield. Miss Thornley had refused to discuss the matter with Mrs. McDonald but did relate the visit of Mrs. McDonald to Bloomfield.

On September 14, 1957, which was a Saturday afternoon, Mrs. McDonald, upon advice of her counsel and after having had her Wilson lot surveyed, constructed a fence along the northern boundary of her lot so as to obstruct traffic from the Bloomfield Lot No. 3 southward onto the Wilson lot. The defendants, Stone and Bloomfield, and their attorney appeared upon the scene before the erection of the fence was completed. Admittedly, a heated discussion occurred between Bloomfield and Stone on the one hand and Mrs. McDonald and her contractor, Mr. Tyler, who was putting up the fence, on the other. The testimony is conflicting as to just what words did pass between the parties. Police were called but no arrests were made. On this date the defendants, Bloomfield and Stone, were fully apprised that Mrs. McDonald was the true owner of the lot and had perfected her record title. Upon the advice of their counsel they physically tore down the fence which had been erected by Mrs.

McDonald. The present suit was instituted within a few days thereafter.

Mrs. McDonald testified that the defendants knew full well that she claimed to own all of the Wilson lot and before the defendants started demolishing the dwelling on the original Lot No. 3, mostly for sentimental purposes she asked one of the defendants about moving the house southward over on her lot. This was refused but one of the defendants did give her some cabinets out of the dwelling house which she was unable to use because of their size. In their answer the defendants stated:

"Admittedly, complainant, Mary C. McDonald, did protest from time to time prior to December, 1956, their possession of said land, and on each occasion was informed that if she could produce satisfactory evidence of title, these defendants and each of them would purchase or lease said land or relinquish possession thereof."

The Chancellor found that the complainant was the legal owner of the lot in question and entitled to the recovery of said lot. Also he held that she was entitled to have the quitclaim deeds removed as clouds upon her title. There is no appeal from these findings.

The defendants admitted that they entered upon and took possession of the lot belonging to the complainant and used the same as their own without any claim or pretense of ownership or permission from anyone. Their only justification for such conduct was that they needed the parking space so badly and that they were willing to purchase or lease the property from the true owner.

The only question raised upon this appeal is the matter of the damages to which the complainant is en-

titled. As to the question of punitive damages the law is clearly settled that in tort cases where a defendant acts fraudulently, maliciously, oppressively, or with gross negligence the court or jury may in its discretion allow punitive or exemplary damages in addition to compensatory damages. Bland v. Smith, 1954, 197 Tenn. 683, 277 S. W. (2d) 377, 49 A. L. R. (2d) 1212.

In the case of Suzore v. Rutherford, 1952, 35 Tenn. App. 678, 251 S. W. (2d) 129, this court speaking through Judge Swepston announced the rule that punitive damages are to be fixed according to all the circumstances attendant upon the incident rather than the one fact of actual damages.

██ All of our Tennessee cases recognize the fact that the financial status of the defendant may be considered along with the other facts in the case in assessing punitive damages. See also Cumberland Telegraph & Telephone Co. v. Poston, 94 Tenn. 696, 30 S. W. 1040; Telephone and Telegraph Co. v. Shaw, 102 Tenn. 313, 52 S. W. 163.

██ From our review of the record in this cause we think the jury and the Chancellor were well warranted in awarding punitive damages against the defendants in this cause. Even admitting that the defendants, in good faith, thought that they had purchased the eastern one-third of the Wilson lot along with their purchase of Lot No. 3 yet we cannot escape the conclusion that they acted oppressively toward Mrs. McDonald, the owner of the lot, after they learned of their mistake. Without any permission from anyone they assumed complete control of the lot, proceeded to pave it as a parking lot including the bulldozing of one or more trees and completely re-

duced the lot to their own use and possession without any color of title or permission and against the protest of the true owner, Mrs. McDonald.

We find it unnecessary to determine whether or not Mrs. McDonald was the owner in fee simple of this lot in 1955 when the defendants began construction of their building and took possession of the lot. She had been in possession of the same paying taxes thereon and exercising all of the indicia of ownership of said lot continuously from 1934 claiming by inheritance an undivided one-fifth interest and claiming four-fifths interest by parol gift of her cotentants.

■ Our Tennessee Courts are definitely committed to the rule that a parol gift of real estate is not void but only voidable and if accompanied by adverse possession the statute of limitations begins to run against the parol donor. Mercy v. Miller, 1942, 25 Tenn. App. 621, 166 S. W. (2d) 628.

■ Certainly Mrs. McDonald was the equitable owner of the Wilson lot and had a title good against everybody in the world except possibly the original cotentants, namely, Mrs. Dick, Mrs. Mahon, Mr. Covington and Mr. Wilson. A stranger, even a creditor, cannot plead the statute of fraud. Culwell v. Culwell, 1939, 23 Tenn. App. 389, 133 S. W. (2d) 1009.

At any rate, Mrs. McDonald at that time did own an interest in the lot, had possession of the same, was protesting the entry and possession of the defendants and the defendants completely ignored her and her interest in the property and began negotiating for a purchase or lease of the property from the former cotentants.

The action of the defendant, Bloomfield, in procuring and recording a quitclaim deed to the lot from his secretary whom he knew to have no interest in the lot whatsoever and knowing at the time that Mrs. McDonald claimed an interest in the lot indicates lack of good faith on the part of the defendant, Bloomfield, in the transaction. His statement that he procured the deed upon the advice of his counsel is negatived by the testimony of his attorney who stated that the deed was written by him upon instructions of the defendant, Bloomfield.

It is true that the attorney, Mr. Glazer, advised Mr. Bloomfield and Mr. Stone to tear down the fence which Mrs. McDonald had erected entirely within the lines of her lot. However, such advice was not a complete defense and justification in view of the fact that Mr. Glazer is also shown to be an officer of Highland Plaza, Inc., and he, as well as the two defendants, Stone and Bloomfield, knew at that time that Mrs. McDonald was the true owner legally and equitably of the lot and that they had never had any status except as naked trespassers.

The defendant, Bloomfield, is engaged in many businesses including that of the principal owner of Southern Builders, a construction company. He testified that his net worth was between $400,000 and $500,000 and that the net worth of the codefendant, Coe Stone was approximately $150,000 and that the net worth of the Highland Plaza, Inc., owned principally by him and the defendant, Coe Stone, was $30,000.

Under all the circumstances we think the verdict of the jury of $7,000 for punitive damages approved by the Trial Judge is fully supported by the evidence and we concur therein. Hence, the assignments of errors 1 and

2 of the appellants, Bloomfield, Stone and Highland Plaza, Inc., are overruled.

### Assignment of Error By Appellee, Mrs. Mary C. McDonald

Mrs. Mary C. McDonald, appellee, has assigned as error the action of the Trial Court in suggesting a remittitur of $2,586.25, thus reducing her recovery for compensatory damages to $3,413.75. This remittitur was accepted under protest by the appellee and she has appealed therefrom as authorized by T. C. A. sec. 27-118.

It is to be noted that in the original bill the complainant, Mrs. Mary C. McDonald, demanded a jury to try the issues of fact. This is in accord with the procedure approved in Gibson's Suits in Chancery, 5th Edition, Section 572, page 633, and as authorized by statute T. C. A. sec. 21-1011.

The original bill was filed on September 24, 1957. The answer of the defendants was filed on October 18, 1957. On October 22, 1957, the complainant was permitted to file an amendment to her original bill by the Chancellor and on the same date, October 22, 1957, complainant filed some ten issues of fact to be submitted to the jury including the two questions of fact which were actually submitted by the Chancellor and answered by the jury.

The cause went to trial on November 7, 1957, before a jury. No suggestion was made at any time during the course of the trial either by the Chancellor or by the defendants that the issues of fact submitted by the complainant had been submitted too late or in noncompliance with the rules of the court.

In disposing of the motion for a new trial by defendants, the Chancellor allowed the jury's verdict for $7,000 punitive damages to stand. He discussed the evidence relating to the compensatory damages sustained by the complainant.

The Chancellor was of opinion that a fair rental value for the use and occupancy of the lot belonging to complainant was $125 per month. He allowed one-half rent as damages from March, 1955, until May 15, 1956, a period of 14½ months and allowed the full monthly rental from May 16, 1956, until November 6, 1957, a total of 17 months making a total of $3,118.75 for rental. He allowed complainant the sum of $265 as the estimated cost of removing the blacktop and gravel and replacing the soil on the lot plus $30 as the cost of the fence which defendants removed from the lot making a total allowance of $3,413.75. He refused to allow the complainant any recovery for the value of shrubbery and one oak shade tree, 2½ feet in diameter, bulldozed over by the defendants and valued by the complainant at $500.

He suggested a remittitur of the remainder of the jury's verdict which the complainant accepted under protest. In concluding his remarks in passing on the motion for a new trial the Chancellor said: "Since no issues of fact were filed by the complainant in compliance with the rules of the court, the court considers the verdict of the jury only advisory and not binding on the court."

The rules referred to by His Honor the Chancellor are the rules of the Tenth Chancery Division which comprises Shelby County and the part pertaining to jury trials is as follows:

"The party demanding a jury shall at least ten days before the first day of the jury term at which the cause is triable, file the issues which he desires submitted for trial by the jury, delivering at the same time a copy to adversary counsel. Thereafter and within five days adversary party or parties shall file such additional issues as they may desire to have submitted to the jury, also delivering a copy or copies of same to adversary counsel. But the Court may, in its discretion, draft issues or cause same to be done so as to avoid delay in the trial of jury cases where the above provisions have not been complied with. Either party may object at the hearing to any issues submitted by his adversary, and, in any event, the Court may recast the issues at any time before submitting them to the jury; and either party may, at the hearing, submit additional issues.

"Calendars of jury cases for both parts of the Court shall be prepared by the Clerk and called in Parts 1 and 2 on days fixed by the Chancellors of Parts 1 and 2 respectively, which days shall be not less than 10 days before the beginning of the Jury Term."

We must respectfully disagree with His Honor the Chancellor that the rules quoted above permit him to treat the jury verdict in this case as advisory only.

In our opinion the record shows a substantial compliance by the complainant with the rules of the court. In the second place the allegations of the complainant's bill and the answer of the defendants in and of themselves made an issue as to the amount of the complainant's compensatory damages to be decided by the jury in ac-

cordance with the prayer contained in complainant's original bill.

In the third place the provision in the rules that either party, may, at the hearing, submit additional issues necessarily implies that issues of fact submitted by the complainant prior to the hearing would not be considered as being filed too late.

Hence, we think His Honor was in error in treating the finding of the jury as advisory only and that in this case the issues of fact as found by the jury were just as binding upon the Chancellor as the issues in any other case properly submitted to a jury in Chancery Court.

■ However, under the general law of our state and under the authority of T. C. A. sec. 27-118, in all jury trials had in civil actions, upon a motion for a new trial the Trial Judge has the authority to suggest a remittitur if he thinks the verdict should be reduced.

We quote said section as follows:

"27-118. Reversal on protested remittitur.—In all jury trials had in civil actions, after the verdict has been rendered, and on motion for a new trial, when the trial judge is of the opinion that the verdict in favor of a party should be reduced, and a remittitur is suggested by him on that account, with the proviso that in case the party in whose favor the verdict has been rendered refuses to make the remittitur a new trial will be awarded, the party in whose favor such verdict has been rendered may make such remittitur under protest, and appeal from the action of the trial judge to the Court of Appeals; and if, in the opinion of said Court of Appeals, the verdict of the jury

should not have been reduced, but that the judgment of the trial court is correct in other respects, the case shall be reversed to that extent, and judgment shall be rendered in the Court of Appeals for the full amount originally awarded by the jury in the trial court. (Acts 1911, ch. 29, sec. 1; Shan., sec. 4852al; Code 1932, sec. 8987; Acts 1949, ch. 253, sec. 1; C. Supp. 1950, sec. 8987.)''

So then in the present case even though we consider the verdict of the jury on the question of compensatory damages as binding on the Chancellor yet we hold that under the authority of T. C. A. sec. 27-118 His Honor the Chancellor had the authority to suggest the remittitur as he did in the present case to the amount of $2,586.25.

Likewise, T. C. A. sec. 27-118 authorizes the appellee, Mrs. Mary C. McDonald, to make said remittitur under protest and to appeal from the action of the Chancellor to this court which she has done. Accordingly, we have reviewed the evidence relating to the amount of complainant's compensatory damages.

Complainant's proof indicated that her lot taken over by the defendants was reasonably worth $30,000. It is shown in the record that the defendants purchased Lot No. 1 from Mrs. Dick for $50,000 and Lot No. 2 from Mrs. Mahon for $60,000. These lots are being used for parking and also possible erection of an additional office building by the defendants at some future date.

One of complainant's witnesses, a real estate man, estimated the annual rental on Mrs. McDonald's lot to be $2,400 per year or 8% of the total value. Defendant, Bloomfield, testified that there is room for at least forty

cars to be parked regularly on Mrs. McDonald's lot. In addition a portion of Mrs. McDonald's lot was used for ingress and egress over to an additional parking lot leased by the defendants from the Sunshine Home for Aged Men to the south of the lot in question. Mr. Bloomfield testified that the current monthly rental for parking spaces in downtown areas was $6 to $7 a month and that there were no other parking lots in this particular area.

Mrs. McDonald testified that the defendants in grading and blacktopping her lot pushed over an oak shade tree 2½ feet in diameter which she valued at $500. Her witnesses testified that it would cost $832.50 to remove the blacktop and gravel and replace the top soil on the lot. Two witnesses associated with the defendants testified that they would contract to do the work for some $250.

The Chancellor was of opinion that the monthly rental on the lot for parking purposes was worth only $125 basing his calculations on experience with some lots which he had in receivership or under his supervision in other causes. Further, the Chancellor disallowed any recovery for the value of the trees or any shrubbery bulldozed over by defendants saying that Mrs. McDonald was not entitled to any recovery for the loss of the trees if she collected the rental of the lot as a parking lot. The Chancellor further accepted the lower price of $265 as the estimated cost of removing the blacktop and gravel and replacing the top soil on complainant's lot.

In our opinion the complainant was entitled to recover a reasonable value for the loss of her shade tree. She said it was worth $500. The jury might well have thought it was worth less being entitled to draw upon their general experience as citizens and residents of Shelby Coun-

ty, Tennessee, as well as to consider the testimony of the complainants.

The jury weighed all the evidence in the light of their own experience and they came to the conclusion that the complainant was entitled to $6,000 as compensatory damages for the unlawful trespass and conduct on the part of the defendants. We think there was ample evidence in the record to support their findings and that the amount of the complainant's compensatory damages as fixed by the jury should not have been reduced by the Chancellor.

Therefore, upon authority of T. C. A. sec. 27-118, the order of the Chancellor suggesting the remittitur of $2,586.25 will be reversed. In all other respects the decree of the Chancellor below will be affirmed and the complainant will be awarded a judgment in the total amount of $13,000 which includes $6,000 compensatory damages and $7,000 punitive damages, together with interest from December 17, 1957, the date of overruling the motion for a new trial. Decree accordingly. Defendants, Bloomfield, Stone and Highland Plaza, Inc., are taxed with the costs.

Avery, P. J. (Western Section), and Bejach, J., concur.