INTERNATIONAL UNION, UNITED AUTOMOBILE, AIRCRAFT AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, AFL-CIO, Local Union No. 1198 United Automobile, Aircraft and Agricultural Implement Workers of America, AFL-CIO, Appellants, v. AMERICAN METAL PRODUCTS COMPANY, Inc., Appellee.—408 S.W.(2d) 682.

Western Section, at Jackson. October 4, 1964.

Certiorari Denied by Supreme Court, April 5, 1965.

528

John W. Hart and J. Howell Glover, Union City, and Lowell Goerlich, Washington, D. C., for appellants, International Union, UAW, and Local Union No. 1198, UAW.

Tom Elam, Union City, and Douglas D. Roberts, Detroit, Mich., for appellee, American Metal Products Company.

CARNEY, J. The plaintiff below, American Metal Products Company, often called Ampco, recovered joint and several judgments in the Circuit Court of Obion County, Tennessee, against the defendant labor unions for $118,775.42 representing $68,775.42 compensatory damages and $50,000.00 punitive damages. The defend-

ants are Local 1198, United Automobile Workers of America of Union City, Tennessee, a corporation, often referred to as the Local Union and International Union, United Automobile, Aircraft and Agricultural Implement Workers of America, AFL-CIO, an unincorporated labor organization often referred to as the International Union.

The case was tried without a jury before Circuit Court Judge E. A. Morris who requested Chancellor Wayne Cox of Paris, Tennessee and Judge R. D. Jones of Dyersburg, Tennessee, to hear the case with him.

The plaintiff, American Metal Products Company, has been engaged in the manufacture of automobile parts in Union City, Tennessee, since 1951. Effective October 1, 1959, Ampco entered into a collective bargaining agreement with the two Unions. This contract expired October 1, 1961 and was extended from day to day until November 14, 1961. At 12:01 A.M. November 14, 1961, the defendant unions went on strike placing picket lines across the entrances and exits to the plaintiff's plant in Union City, Tennessee. The defendant Local 1198 had 388 members, all employees of the plaintiff's plant in Union City, Tennessee. Nearly all of the members went on strike and participated at various times in the picketing activities.

Plaintiff's declaration averred that the defendants followed a pattern of harassment, intimidation, coercion, violence and threats of violence against the plaintiff's customers, its employees and persons having business with the plaintiff as a result of which plaintiff lost forty-eight working days out of a total of an annual 246 working days and that it sustained actual damages of $350,-000.00 in fixed cost expenses and loss of profits resulting from cancellation of sales. The declaration also by a sec-

ond count sought to recover punitive damages in the amount of $350,000.00.

It was the contention of the defendants:

(1) That the Circuit Court had no jurisdiction over the defendants:

 (a) Because of defective process;

 (b) Because of Federal preemption by the National Labor Relations Act of 1935 as amended by the Taft-Hartley Act of 1947.

(2) That there was no misconduct on the part of the defendant Unions or their members.

(3) That if there was misconduct and illegal and violent action on the part of the members of the defendant Unions, then the defendant Unions themselves were not legally responsible for such actions and did not participate in, authorize, ratify, or condone such illegal activity, if any.

(4) That any damages sustained by the plaintiff were the natural and direct result of a legal strike and the normal and legal activities incident thereto including picketing and such damages were therefore not compensable.

The Trial Court, in its finding of fact, stated that it found from an "overwhelming preponderance of the evidence" that the defendant Unions actively engaged in a concerted pattern of conduct and action which grew out of a malicious intent to wrongfully interfere with the plaintiff's business operations, its employees, suppliers, etc. and that the illegal conduct consisted mainly of "continual harassment, abusive language, mass picketing, intimidations, coercion, threats, picketing accompanied

by violence, public disorders, frightening conduct, all of which created a state of cringing fear in the area of influence of Obion County in violation of the common law of Tennessee.''

The Trial Court disallowed any recovery for loss of profits. It found that the plaintiff's plant was out of operation from January 3, 1962, through January 20, 1962, a period of fourteen working days by reason of the illegal, wrongful concerted activities of the defendants; that the daily fixed cost of the Union City plant was $4,912.53 per production day and therefore recovery of compensatory damages in the amount of $68,775.42 was allowed. The Trial Court found the defendant Unions guilty of willful and wanton conduct and willful and intentional interference with the plaintiff's business operations and allowed the recovery of punitive damages in the amount of $50,000.00 making a total judgment against both defendants of $118,775.42.

The defendant Unions have appealed and filed 31 assignments of error. The record is voluminous with fifteen volumes and approximately 1800 pages. The trial below lasted two weeks and every issue was hardfought every step of the way by the able counsel on each side. Yet at all times the counsel for each side were courteous and respectful of adversary counsel and of the court. They displayed the same courteous but zealous presentation of their clients' interests upon the oral argument before this Court.

Since the case was tried without a jury it comes to this court on appeal for trial de novo accompanied by a presumption of correctness of the judgment below, T.C.A. Section 27-303.

The plaintiff, American Metal Products Company, is chartered in the State of Michigan but qualified to do business in the State of Tennessee. In the operation of what it calls the "automotive division" the plaintiff operates plants at Detroit, Michigan, Union City, Tennessee, and Arcadia, Louisiana. The plant in Union City makes wire springs, front and rear seat frame assemblies for the automotive industry primarily Ford and Chrysler. The home office of Ampco is in Detroit, Michigan. Each month the plant in Union City receives notice of the number and type parts to be manufactured and the date they are expected to be ready for shipment to the ultimate purchasers such as Ford and Chrysler.

Mr. A. J. Luther of Union City, Tennessee, was the manager of the Union City plant and in full charge of its operation. Mr. William Barter of Detroit, Michigan, was the personnel director of the entire automotive division of American Metal Products Company including the plant at Union City.

As the name implies, the International Union, United Automobile, Aircraft and Agricultural Implement Workers of America, AFL-CIO, is a labor organization. Its membership numbers more than a million workers of the automotive industry. Headquarters are in Detroit, Michigan. Regional and local offices are maintained throughout the United States and Canada. Walter Reuther is the president. As of December 31, 1961, the International Union had a net worth of fifty million dollars and a strike fund in excess of thirty-six million dollars.

The defendant Local Union No. 1198, United Automobile, Aircraft and Agricultural Implement Workers of America, AFL-CIO, represents the local office of the International Union in Union City, Tennessee, and its

membership apparently is composed exclusively of workers in the American Metal Products Company plant in Union City, Tennessee.

A member of the local union pays monthly dues of $5.00, of which $1.75 is sent to the International Union as a per capita tax, $1.25 goes into the International Union strike fund and $2.00 is retained by the local union. The Local Union 1198 occupies a meeting hall known as the Union Hall in Union City located some 257 feet from the main entrance to the Ampco plant in Union City. The main entrance is on Reelfoot Avenue, a much traveled thoroughfare bearing the traffic of both U. S. Highway 51 and Tennessee Highway 22. The financial condition of the Local Union was not proven.

The charter of Local 1198 provides that the local organization "forever and under any and all circumstances shall be subordinate to and comply with all the requirements of the constitution of the International Union and be guided and controlled by all acts and decisions of the International Union." Mr. Leroy Bradley of Union City, Tennessee, is the president of Local 1198.

Mr. E. T. Michaels was the director of Region 8 of the International Union and Local No. 1198 is a part of Region 8. Mr. C. E. Strickland was an International Union representative employed and paid by the International Union. His duties are "to assist and advise various local unions, which includes Local 1198, in their everyday problems, including the conduct of a strike."

Assignments of error 1 and 2 insist that the defendant Local 1198 was never legally served with process and that His Honor the Trial Judge erroneously sustained plaintiff's demurrer and overruled the defendant Local

Union's plea in abatement. Plaintiff's declaration was filed on February 24, 1962. The declaration described the defendants as follows:

"The International Union, United Automobile, Aircraft and Agricultural Implement Workers of America, AFL-CIO, is an unincorporated labor association with its Memphis area offices located at 1190 Walker Avenue, Memphis, Tennessee; Local Union No. 1198, United Automobile, Aircraft and Agricultural Implement Workers of America, AFL-CIO, is an unincorporated labor association with its principal office and place of business located on Ury Street in Union City, Tennessee; C. E. Strickland is an international representative of the International Union with an office located at 1190 Walker Avenue, Memphis, Tennessee; Leroy Bradley is President of Local Union No. 1198; Billy Sturdivant is Vice-President of Local Union No. 1198; Bill Griffin is Recording Secretary of Local Union No. 1198; Hubert Stone is Financial Secretary of Local Union No. 1198; Charles Curlin, Edward Hill and James S. Mitchell are Trustees of Local Union No. 1198; Woodrow McKinnis is Sergeant at Arms of Local Union No. 1198; Briley A. Hime is Guide of Local Union No. 1198; and James Bass, Chester Hundley, Wilbur Conova, Edward Ellegood, Bill Wyatt and Elmer Parker are members of the Bargaining Committee for the Local Union No. 1198.

"All of the above named individual defendants, other than C. E. Strickland, have a place of business on Ury Street in Union City, Tennessee."

Original process was issued by the Circuit Court Clerk to the Sheriff of Obion County and bears the following officer's return:

"Came to hand on March 15, 1962, and executed by reading the within summons to LeRoy Bradley, Billy Sturdivant, Hubert Stone, Edward Hill, James S. Mitchell, Woodrow McKinnis, James Bass, Chester Hundley, and Billy Wyatt on this date and leaving a copy of the declaration with LeRoy Bradley, President of the local Union.

This March 26th, 1962.

S/ R. E. Woodard
_____
Deputy Sheriff

Bill Griffin, Charles Curlin, Briley A. Hime, Wilbur Canova, Edward Ellegoode and Elmer Parker are not to be found in this county

S/ R. E. Woodard
_____
Deputy Sheriff"

This process bore a statement that counterpart process would issue to Davidson County, Tennessee.

Process was issued February 24, 1962, by the Circuit Court Clerk to the Sheriff of Shelby County to summon the defendant, C. E. Strickland. On April 4, 1962, alias summons was issued by the Circuit Court Clerk for C. E. Strickland to the Sheriff of Obion County and returned "could not locate." On April 4, 1962, alias process was issued by the Clerk of the Circuit Court to the Sheriff of Obion County for C. E. Strickland, individually and as International representative for United Automobile, Aircraft and Agricultural Implement Workers of America, AFL-CIO and was served on April 26, 1962. Counterpart summons was issued March 27, 1962, by the Circuit Court Clerk to the Sheriff of Davidson County, Tennessee, to summon United Automobile, Aircraft and Agricultural

Implement Workers of America, AFL-CIO and the summons bears the following return: "Served April 12, 1962, by registered letter to Joe C. Carr, Nashville. Served on Secretary of State 4/5/62 Emmett E. Clifford, Deputy Sheriff."

On May 7, 1962, the defendant Local 1198 filed a plea in abatement stating that original process had been issued against it as an unincorporated association instead of a corporation and prayed that the summons and declaration be abated and quashed.

On May 7, 1962, the defendant, International Union, UAW, etc. filed a plea in abatement to the declaration and summons on the following grounds: (1) That C. E. Strickland was not its agent within the meaning of the statute authorizing service of process and (2) that since the International Union was not a resident of Obion County and did not maintain an office in Obion County there was no authority in law for the plaintiff to have process issued against it and served upon the Secretary of State.

On May 23, 1962, the plaintiff took voluntary nonsuits against the defendant, C. E. Strickland, individually, and as International representative, Bill Griffin, Charles Curlin, Briley A. Hime, Wilbur Conova, Edward Ellegood and Elmer Parker.

On May 24, 1962, the plaintiff asked for and was granted permission by the Circuit Judge to amend its summons and declaration as follows:

"To delete the name 'Local Union No. 1198, United Automobile, Aircraft and Agricultural Implement Workers of America, AFL-CIO' where the same appears on the summons and in the declaration and insert,

in lieu thereof, the name 'Local 1198, United Automobile Workers of America of Union City, Tennessee'; and

"To delete the words 'an unincorporated labor association' from lines six and seven, paragraph three, page two, of the declaration and insert, in lieu thereof, the words 'a Tennessee Corporation'."

On May 24, the plaintiff then filed demurrers to the pleas in abatements of the defendants which demurrers were sustained and the pleas in abatement overruled and disallowed.

No additional process was ever issued and served upon the defendant Local 1198 as a Tennessee Corporation. It is the insistence of the defendant Local 1198 that it was therefore never legally in court and that the proceedings and judgments against it were coram non judice; that the difference between an unincorporated association of individuals and a corporation is substantive and that it was never brought legally into court as a corporation by the service of process as provided by T.C.A. Section 20-217. Appellants cite and rely upon a statement from Higgins and Crownover, Tennessee Procedure, Section 805, as follows: "If, however, a new party defendant be added, the action is regarded as a new one as to him, an additional process to bring him into court is required."

█ The characterization in plaintiff's declaration of defendant Local 1198 as being unincorporated constituted simply a misnomer of the defendant Local Union No. 1198 which the defendant had a right to question by its plea in abatement. However, the plaintiff removed the defect raised by the plea in abatement by offering an amend-

ment setting out the correct name of the defendant Local Union No. 1198 as a corporation.

■ "With our liberalized practice as to amendments, it seems now that the misnomer of a corporation is fatal only when it is so material and substantial as to indicate a different entity or produce doubt as to the corporation intended to be sued. When not misleading, the only effect is to entitle the defendant, on proper and timely objection, to have the action abated until the misnomer is cured by amendment." Gibson's Suits in Chancery, 5th Edition, Section 96, page 136.

In the instant case the plaintiff and the Trial Court followed the procedure suggested in History of a Lawsuit, 8th Edition, Section 186, page 234:

"It is proper now to consider what should be the course of the plaintiff when he is confronted with a plea in abatement. If he sees that the plea is true and is sufficient in law to abate the suit, he may prevent the abatement in many cases by amending his writ and declaration. If the writ in fact issued on Sunday, and that be the ground of the plea, of course there would be no remedy. But if the plea is a misnomer of the plaintiff or defendant, the plaintiff may amend by inserting the true name. The names of parties may be stricken out of the writ and pleadings, or inserted in them, either as plaintiffs or defendants, so as to have the proper parties before the court. * *"

Assignments of error 1 and 2 are therefore respectfully overruled.

Assignments of error 3, 4, 5, 6 and 7 all raise the question as to whether or not the defendant, International Union, was properly served with process at the time of

the trial in the court below. Process was had upon the International Union by service upon Joe C. Carr, Secretary of the State of Tennessee, under the authority of T.C.A. Section 20-223 which we quote as follows:

"20-223. Actions against unincorporated associations.—Any unincorporated association or organization, whether resident or nonresident, doing or desiring to do business in this state by performing any of the acts for which it was formed, shall, before any such acts are performed, appoint an agent in this state upon whom all process may be served, and certify to the clerk of the circuit court of each county in which said association or organization desires to perform any of the acts for which it was organized the name and address of such process agent. If said unincorporated association or organization shall fail to appoint the process agent pursuant to this section, all process may be served upon the secretary of the state of Tennessee. Upon such service, the secretary of state by registered return-receipt mail shall forward a copy of the process to the last known address of such unincorporated association or organization. Service upon the process agent appointed pursuant to this section or upon the secretary of state, if no process agent is appointed, shall be legal and binding on said association or organization, and any judgment recovered in any action commenced by service or process, as provided in this section, shall be valid and may be collected out of any real or personal property belonging to the association or organization. [Acts 1947, ch. 32 sec. 1; mod. C. Supp.1950, sec. 8679.1 (Williams, secs. 8681.1-8681.3); modified.]"

■ The legality of this Code section was established in the case of McDaniel v. Textile Workers Union of Amer-

ica (1952), 36 Tenn.App. 236, 254 S.W.2d 1. We find no merit in assignments of error 3, 4, 5, 6 and 7 and they are respectfully overruled.

██ Assignment of error No. 8 assails the action of the Trial Court in overruling the defendants' motion for a more specific statement of the wrongs, injuries and items of damage complained of by the plaintiff. This was a matter which was within the sound discretion of the Trial Court. May v. Illinois Central Railroad, (1914), 129 Tenn. 521, 530, 167 S.W. 477, L.R.A. 1915A, 781. We see no abuse of this discretion and see no prejudice to the defendants for the denial of the motion. The defendants exercised their right of discovery and did not appear to have been surprised by any of the evidence introduced by the plaintiff. Apparently they met all material issues of fact presented by the plaintiff with contrary evidence. Therefore, the assignment of error is respectfully overruled.

Assignment of error No. 9 insists that the Trial Court abused its discretion in disallowing defendants' motion for leave to amend their pleas of the general issues by adding the words ''and demands the jury to try the issues in this cause joint.'' The motions were supported by affidavit that failure to demand the jury in the pleas of general issue had been unintentional and that the mistake was excusable because attorneys for defendant were changing secretaries at the time the pleas were drafted and his office was in a state of confusion. The Circuit Court of Obion County, convened on the first Monday in May, 1962, and no demand was made for a jury by defendants on that day. The pleas of general issue for the defendants were filed on May 31, 1962. The motion to amend so as to demand a jury was filed on June 23, 1962.

Jury trials in civil cases are regulated by our statutes T.C.A. Sections 20-1203, 1204 and 1205 which we copy in full as follows:

"20-1203. Demand for jury on first pleading.—When any civil suit is originally brought in any of the courts of record, which is triable by jury, either party desiring a jury shall demand a jury in his first pleading tendering an issue triable by jury, or he shall call for the same on the first day of any term at which the suit stands for trial, and have an entry made on the trial docket that he calls for a jury; and unless such demand is made and entry thereof on the trial docket, it shall be the duty of the court to try the case without a jury. [Acts 1875, ch. 4, sec. 1; 1889, ch. 220, sec. 1; integrated in Shan., sec. 4611; Code 1932, sec. 8734.]

"20-1204. Jury demand on first day of term.—In the case of all other suits, either party desiring a jury shall call for the same, on the first day of any term at which the suit stands for trial, and have an entry made on the trial docket that he calls for a jury, and unless such demand is made and entry thereof on the trial docket, it shall be the duty of the court to try the case without a jury; and if no such demand or call is made as aforesaid, and in the manner and time as aforesaid, the clerk shall place such cause on the docket to be styled the 'nonjury docket.' [Acts 1875, ch. 4, sec. 1; 1889, ch. 220, sec. 1; integrated in Shan., sec. 4612; mod. Code 1932, sec. 8735.]

"20-1205. Effect of jury demand or failure to demand. —A failure so to demand or to call for a jury shall be held, conclusively, an agreement of the parties to submit all issues and questions of fact to the decision of the judge without a jury; and, if such demand or call

is so made, the clerk shall place the cause wherein the demand or call is made, upon a docket to be styled 'jury docket.' [Acts 1875, ch. 4, sec. 1; 1889, ch. 220, sec. 1; integrated in Shan., sec. 4613; Code 1932, sec. 8736.]''

In our case of Shelton v. Hickman, (1943), 26 Tenn. App. 344, 172 S.W.2d 9, opinion by our late and lamented brother J. Roy Hickerson, the pleadings contained no demand for a jury. No demand was made on the first day of the term, February 2, 1942. On February 10, 1942, the Circuit Judge entered the following order:

''Upon due consideration of the motion by one of the counsel for defendants; it appears that on January 24, 1942, when the Presiding Judge was making up a trial docket for the February Term of court, said counsel advised the court that the above styled case was on the Non Jury docket. He requested that it be placed upon the Jury docket as it was a contested will case and it was imperative that the issues be tried by a jury. To this request the court agreed.

''It is therefore ordered that said case be placed upon the Jury docket and set for trial under the rules of court governing the trial and disposition of Jury cases.

''To the foregoing action of the court, the proponent excepts.''

This court held that the foregoing order was not a substantial compliance with the provisions of the Code relative to demanding a jury and that it was imperative that litigants follow the methods set out in the Code in order to demand a jury and that His Honor the Trial Judge was in error in requiring a jury trial over the

objection of the opposing counsel. However, the court held that since there was no bill of exceptions preserved in the record it did not affirmatively appear that the error of the Trial Court affected the results of the trial. Hence, it was harmless error. The case of Shelton v. Hickman was later approved by this court in the case of Wrinkle v. Williams, (1953), 37 Tenn.App. 27, 32, 260 S.W.2d 304.

■ Therefore, His Honor the Trial Judge quite properly refused to grant the motion to demand a jury and assignment of error No. 9 is respectfully overruled.

■ Assignment of error No. 10 insists that the judgment rendered in the case below is erroneous and void because it is not the unbiased and independent decision of the duly elected and legally qualified and commissioned Judge of the 14th Judicial Circuit; that the finding of the regular Judge, participated in by two others at his invitation, is a nullity because a three-judge court is unknown to the law of Tennessee. Apparently the defendants made no objection whatsoever to the three Judges sitting as a panel and hearing the case. The regular Circuit Judge presided over the three-judge panel, ruled on all questions of evidence and at no time during the trial do we find any of the other judges having any participation in the conduct of the trial except they all three signed the written finding of fact. The regular Circuit Judge, Honorable E. A. Morris, was the only judge to sign the order entering the judgment. Granting that this is novel procedure and that there is no provision therefor in the statute or case law of our state, yet it does not appear that the defendants were prejudiced by such action. In the absence of any affirmative showing of prejudice and in the absence of any objection in the record to the three-judge panel

sitting as such we feel constrained to overrule the assignment of error.

By assignment of error No. 11 the appellants insist that the court below erred in admitting into evidence proof of acts of violence committed by members of defendant Union upon other individuals and upon property of the plaintiffs during the period of the strike because there was no independent evidence that the defendant Unions expressly authorized or ratified such violent conduct. There is an overwhelming preponderance of evidence in the record that during the period of the strike, the members of Local No. 1198 created a veritable reign of terror in the town of Union City and surrounding area. Mobs of striking employees blocked the driveway to the plaintiff's plant. There were threats and curses. Customers and suppliers were physically prevented from entering the property of the plaintiff. Nonstriking employees were threatened with death; other employees were physically assaulted; homes were dynamited; a foreman's automobile was overturned in the street; an automobile owned by the company was fired upon with a shotgun when parked in the driveway of a company official. The following morning employees hollered "Bang, Bang" as the company official entered the company grounds. The strike was called with the knowledge and consent of the International Union and representatives of the International Union were on the scene during the entire period of the strike and during the entire period that the reign of terror prevailed. They furnished bail bond and attorneys to Union members charged with violent conduct. We think the evidence was clearly competent and assignment of error No. 11 is respectfully overruled.

Assignments of error 12, 16, 17, 18, 19, 20, 21, 22, and 23 all attack the findings of the Trial Court that the defendant Unions acquiesced in and ratified the acts of violence by the striking employees to the extent that such unions were legally liable for the damages sustained by plaintiff as a result of such violence. We cannot in this opinion discuss all of the evidence heard by the Trial Court during this lengthy trial. We do quote at length from the review of the testimony and findings by the Trial Court as follows:

''From the testimony of HAROLD COOPER, the Sheriff of Weakley County, on January 26, four men were brought in to the City Hall at Martin for an assault upon an automobile of Dennis McDougal, and one of the four, Lon Ransom, said he would accept full responsibility for the damages to the windows of the car. Charges and counter-charges were prepared. Mr. George Rowlett, an attorney at Martin, made appearance for the four men and all charges were dismissed. (Professional fees paid by Union).

CLYDE MILES, Deputy Sheriff for Weakley County, was present with the Sheriff. He examined the automobile in which Ransom, Forbus and the two Whitesides were riding, he found a brick, slingshot, and a number of smooth rocks; the latter items being placed in a sack by him. Jessie Whiteside stated that Lon Ransom did the shooting. The four strikers told him that McDougal was trying to take their jobs. (Assault and battery on property belonging to an employee of AMPCO).

VIRGINIA C. LASSITER: Deputy Clerk and Master, at Union City, who operates a rooming house, testified that there was an explosion which blew out most of the

windows on the side of the house where one Wilhelm lived.

Depositions of C. E. Strickland and Leroy Bradley were read into the record.

A. J. LUTHER, the Plant Manager, for the Tennessee Plant, and was so engaged during the period of negotiations and at the time of the strike, testified as follows: (From his notes or independently)

November 14: There were an estimated 80 to 100 pickets around our gate that morning and that they were yelling and screaming in abusive language. The pickets were slow in walking their posts and cars had difficulty entering. (No car was permanently physically blocked).

November 15: This witness estimated that there were 150 strikers around the main gate. Mr. C. E. Strickland was in the crowd.

November 16: Luther testified that there was an estimated 110 pickets on or near the gate and that he noted 'Mr. Strickland and Mr. Bradley were there on that day'. Two trucks were denied entrance, physically blocked by the strikers.

November 17: That there were an estimated 100 pickets around the plant ganged in the entrance. A taxi and two salesmen were denied entrance.

November 20: An unusually large group of angry strikers and pickets, estimated to be 150. They had the entrance blocked. They blocked the entrance to the plant and refused to permit Mrs. Grooms, the plant nurse, to enter the plant in the car. At that time, Strickland, Bradley, Bass and Hundley were in the group. She later gained access to the plant.

November 21: There were about 75 strikers down there at the gate who denied entrance to Don Lowe and his wife. He was an employee. Later he entered with another employee. A representative of the Steel Company could not get in the plant.

November 22: Fifty to sixty pickets were at the gate.

November 24: Employees from the Telephone Company who had been summoned to make repairs inside the plant were denied entrance. (Upon such denial, the Court is of the opinion that they honored and refused to cross picket lines.)

November 27: 50 strikers were at the entrance.

November 28: 25 pickets were in front of the main gate.

November 29: 30 pickets were at the gate and they refused admission to a Sartain truck and one from Dyersburg, the Dyersburg Express. The Sartain truck entered the plant premises after a delay. (The Court is of the opinion that the Dyersburg Express preferred to avoid the issue and returned home.)

November 30: Tom's Candy Truck was blocked and it did not return during the strike. (From independent recollection.)

December 4: 30 to 40 pickets were at the entrance during the day. 'They were using abusive language'. A Chevrolet truck was denied admittance.

December 5: The Viking truck was stopped from entering according to Mr. Luther.

December 11: There were an estimated 150 strikers around the main entrance. There was a lot of abusive

language directed against the 'Supervisors'. Bradley was in the group.

December 25: Someone with a shotgun blasted Luther's station wagon which was parked in the driveway at his residence. Upon this witness' arrival at the plant the next morning, he was greeted by the strikers with ''Bang-Bang'.

'It is to be noted that January 3rd is the day after negotiations broke down in Memphis'.

January 3, 1962: Mr. Luther estimated that there were 150 angry, violent people in front of the main entrance, and in the highway. That they were in a bad frame of mind, an angry mob, abusive, shaking their fists. (Mr. Barter corroborates Mr. Luther.) Mr. Luther testified that, 'I will admit that it seemed to get worse on January 3rd.'

PERRY CARTWRIGHT, a foreman, was followed and his car was turned over as it neared the main entrance. James Smith, Traffic Manager, for the Plaintiff was riding with Cartwright. Another foreman, Tom Brown, who was following Cartwright's car was rocked and shaken by the throng of pickets. The radio aerial on his car was broken.

January 4: There were 50 pickets and strikers at the main gate. C. E. Strickland was one of them.

Forcum-Lannom truck undertook to enter the plant on company business but was physically prevented from entering.

There were so many strikers in the area and along Reelfoot Avenue that it caused a traffic hazard.

January 8: There were 95 pickets and strikers at the main gate, yelling, shouting, screaming. The Nailling incident is described by this witness.

January 9: There were estimated to be 50 pickets in front of the main entrance, at which time an unusually large number of TACKS were found scattered in the driveway causing punctures and ruined tires.

January 12: One Richard Fickle, a supervisor tried to enter the plant with his brother, but they were denied admittance even though there were policemen on duty at the time. The Hays truck did not enter. (Presumably the driver refused to cross the picket lines.)

January 15: There were 30 to 40 slowly moving pickets around the main gate. Many roofing tacks and nails were found in the driveway.

January 16: There were 50 to 75 pickets and strikers at the entrance or main gate. Certain persons in the crowd were shouting and shooting fireworks.

January 17: The group appeared vicious, increasing intense feeling, screaming, yelling and shouting. When a Volkswagen attempted to enter, it was completely surrounded and picked up by pickets, turned around at the gate and pushed from Reelfoot Avenue towards Union Hall. C. E. Strickland was in the vicinity. On the same day, two women who attempted to come in to the plant were pushed, shoved, by the pickets and strikers and also prevented them from entering. Policemen were present. (One testified). A truck was blocked. Another truck loaded with steel was blocked from entering.

January 18: There were 150 pickets and strikers about the plant entrance, crowding into Reelfoot Avenue. The

Company's employees were harassed. Strickland was in this group with Bradley, Bass and Ashley.

January 19: In the opinion of the officials it was inadvisable even for the supervisors and the female employees to enter.

An injunction was issued on late January 20. Thereafter, pickets restricted their conduct to slow moving. Great numbers of tacks were found in the driveway on January 23. 1962.

The practice of taking pictures, setting up tacks in the driveway continued through January 25, 26, and 29.

January 29: Striking employees created such a traffic jam along Reelfoot Avenue that it was necessary for the State Highway Patrol to clear the area.

Under these circumstances it was impossible to gather people into the plant until the injunction was issued. (Supervisory personnel, 40 carried on Company payroll.)

W. N. BARTER. Director of Personnel for American Metals for twenty years, was familiar with the situation at Union City regarding the industrial difficulties prior to and during the strike.

In substance, during the period he was present in Union City, he corroborated with Mr. Luther with regards to the incidents, action and conduct of the pickets and strikers, and people seeking entrance to the plant.

MR. BARTER further related a conversation with Mr. E. T. Michaels, who is Regional Director for the Defendant, International Union, at which time he informed Michaels that it might be necessary to attempt to hire people to operate the plant in Union City, at which time

Michaels told him that, if the Plaintiff decided to hire anyone in the plant 'We would tear this town apart.'

He described the maneuvers of the pickets.

He observed the Volkswagen incident and at the time he saw Bass, Strickland, Bradley and Wyatt in the crowd. He also related that on January 18, a man and a woman, who were deaf-mutes, made an effort to enter the plant. They were roughed up. Bradley was in the crowd.

WILLIAM AUSTIN NAILLING, a businessman in Union City, who operated Nailling Mill and Lumber Company, testified that due to trouble at Plaintiff's plant his regular employees declined to go back down there and he and volunteer crewmen approached the gate. The crowd began to yell and invective words were uttered. There were more than 65 people there. He and his men were pelted with small rocks, bricks and verbal abuse. Police were there. Strikers struck the truck, one jumped under or in front of the truck. When he neared the gate, there was a barrage of small bricks and someone shot or fired a steel ball at him, breaking the glass in the guard-house, narrowly missing his head. As they drove out of the area, they were attacked again. His hat was knocked off and he was struck on the arm by a piece of brick. Some of the strikers said, 'You are going to be stretched out beside your mother tomorrow night'. (Witness' mother buried a few days previous to this incident). He saw Ray Dan Ashley throw a rock at him and observed O. T. Garner in the crowd. Later, about seven people in a station wagon drove up to his home where he and his wife were standing, threatened him and said, 'You are going to get it'. He was threatened repeatedly and he received phone calls for several weeks after the attack. (Callers not identified)

JOHN SAMUEL LAWS, of Clinton, Kentucky, was employed at the plant in January, worked four days and quit. He declared, 'It wasn't worth it'. One union member told him if he caught him out anywhere, he was going to beat hell out of him. He was threatened in a pool hall at Clinton. He worked one day after this threat was made to him.

REUBEN KIMBALL, a guard at the plant, who was on duty at the guardhouse at or near the main entrance daily, said that he observed the pickets, strikers, and estimated their number from day to day, in about the same manner and character as did Mr. Luther. He gave definite details to the conduct and the incidents, familiar with the situation. He further testified that he saw C. E. Strickland in the crowd almost daily. On occasions he observed Bradley and other officers in the crowd. He made a number of pictures which were introduced into the record.

GERTRUDE GROOMS, registered nurse, who provides first aid for anyone injured in the plant, testified on November 20, as she and her husband drove to the gate she was stopped. James Bass told her she couldn't go in. Mr. Strickland suggested that she ride in with one of the foremen. She finally gained entrance by riding in with Mr. Luther. In her estimate there were 25 or 30 pickets around her car.

BILLY RAY BAKER, went to work the middle of January. On February 1st while in the parking lot he was struck in the face by James Younger, a striker, who, prior thereto, asked him if he were working at Plaintiff's plant.

After receiving a phone call, he worked a few days and then quit, as he stated that it 'wasn't worth it to keep on like that'.

MR. W. D. FRIZZELL, the City Manager and Director of Safety for the City of Union City, testified as follows:

He had policemen on duty at the Plaintiff's plant as of January 2nd and 3rd and had police cars in the area of the gate practically all the time from the time Cartwright's car was turned over until the strike ended. He and the Chief of Police felt that the situation was out of control and he made an affidavit in support of Plaintiff's application for an injunction in the Chancery Court. He instructed the Chief of Police to call the Sheriff's office and Highway Patrol for help, which was not forthcoming and he and the Mayor sought the assistance of the Attorney General. Strickland was ACQUAINTED with all the difficulties.

The gist of this testimony, coupled with others, the Court finds: That on or about January 3rd, the situation was completely out of control, there existed a riotous condition, cringing fear, in the community of Obion County.

At a later date, Mr. Frizzell wrote a letter to the local president seeking peaceful and mutual understanding.

HARRY FARLEY testified the he commenced work in January or February. After he started to work, two cars and a truck were mutilated by shotgun blasts. He quit work the last of March because, 'he felt it would be healthier'.

PERRY CARTWRIGHT, General Foreman, testified that his car was turned over by strikers and pickets on January 3rd when he undertook to enter the gate. He

recognized Jim Doughten, Cecil Stacks, Clarence Stacks, Ray Dan Ashley and Herbert Andrews, all strikers in the crowd.

SAMUEL DRIVER started to work for the company on January 22. When he left work he was followed by several cars, which blocked his way. A number of these people surrounded his car, cut one tire, broke his windshield and knocked off the radio aerial. The license numbers of the cars involved belonged to Cecil Green, H. L. Suiter and Ruby Grady. The damage was caused by a lug bolt wrench being used by the big guy.

DENNIS McDOUGAL, while attempting to enter the plant for purpose of employment, was advised by the strikers to go home. Later he returned and gained admission. He had to be escorted out of town by the police. He was followed by strikers. He went to work, en route home he was followed by two cars who forced him to slow down, then shot holes in the windows of his car.

This is the same incident testified to by the peace officers of Weakley County.

JOE ARMBRUSTER was employed on January 25. On the following Saturday afternoon, Gifford Hopkins, James Jackson and Stewart, all strikers, came to his house and told him not to return to work and if he did, there would be trouble, and that he was 'liable to be hurt'. On February 9, all four tires were cut on his car and the windows broken.

BERTHA LITCHFORD, a resident of Obion, lives with her aged father. She went to work at the plant on January 29th. On the night following the day she put in her application, (January 23-24), Ray Dan Ashley came to see her and told her of the things that were happening

to other people trying to work at Plaintiff's plant. He said he wouldn't do anything to her but he couldn't say for the rest of 'Our boys'. On February 8th, while she was visiting her father in the hospital at Union City, her car was completely covered with black tar. On February 9th, two tires were cut. While she was in Union City, a brick was thrown through the window of her father's house in Obion.

BILLY OVERALL commenced work on January 27, and shortly thereafter had a fight with a striker, Earl Barnett. On February 17th, a bomb was exploded in the front yard where he lived. His ford car was blown to pieces.

PAULINE HANKS started to work on January 26th. She received vulgar phone calls. On January 30th nine shots were fired into her house in Kenton, Tennessee.

HAYWOOD BING went to work January 24th and on the night of February 10th a car drove by his house, at which time a shotgun blast was fired through his front door.

OLIVER GREEN, a resident of Martin, commenced work on January 27th. On the morning of January 31, upon arriving at the plant in Union City, he found three sticks of dynamite with burnt out fuses in the grill of his automobile. On February 9th, a brick was thrown through the window of his automobile. On the same day, four tires were slashed on a borrowed car he was operating.

AUBREY PUGH began work on January 29th. Upon his departure from the plant, pickets warned him they would see him tonight. During the night, sugar was put into the gas tank of his automobile.

LOIS VIA commenced work on January 29th, and on February 6th, three tires were slashed on her car, which was located in a garage behind her house.

WILMA GREEN, wife of former witness, Oliver Green, corroborated her husband with reference to the dynamite incident. She was threatened on two occasions by strikers who informed her that she and her husband wouldn't be able to work.

RANCE FRY commenced work sometime in January and on March 18th, early in the morning, a dynamite bomb was exploded in his front yard, demolishing the front windows in his house.

HARRY HAGUE was hired on January 26th, went to work on the 29th. In the month of March, the windshield of his truck was shot out by a shotgun blast. Later a bomb was thrown in his yard. Shortly after the bombing, he was called frequently, and threats were made that 'We are going to blow you plumb off the map'.

WILLIAM GREEN commenced work on January 26th. On March 18th, tires were cut off of his car. He and two other employees were assaulted at the Lake. Ray Dan Ashley was one of the leaders of the fracas.

JAMES BASS, Official of the Local, admitted that on occasion the entrance to the plant was physically blocked. That there were about 150 to 200 strikers in the area at the time of the Cartwright incident.

JOHN FRANK FORBUS was a striker who was in the vehicle which was involved in the McDougal affair. He identified himself, the two Whitesides, and Lon Ransom as being the pursuing vehicle.

RAY DAN ASHLEY, a picket captain pleaded guilty to assault and battery. (Cause Number 2144) upon an

indictment growing out of these matters and was fined $250.00, 60 days to serve. He admitted that he, Cecil Stacks, Clarence Stacks, Gaylon Williams and Jim Doughen, all strikers, were convicted in the Circuit Court, Obion County, upon an indictment of malicious mischief against the automobile owned by Perry Cartwright.

Depositions of Mr. Strickland and Mr. Bradley were read into the record.

Special attention was called to the inflammatory remarks made by officers, officials and agents of said Union, which remarks were reasonably calculated to create reaction and to incite violence.

The record shows in the course of assisting Local 1198 in the conduct of the strike, Strickland was in Union City on November 1961, 13, 14, 15, 16, 19, 20, 21, 28, 29 and 30; on December 7, 11, 20, 21, 27, and 28; on January 1962; 2, 3, 4, 8, 15, 16, 17, 18, 22, 23, 24, 26, 27, 28, 30 and 31.

In addition to strike benefits furnished by the International certain strikers were bonded (strikers charged with violence) and the premium paid directly to home office by the U.A.W. (Financial aid)

The animus of the membership of the Union with the will-to-execute the 'we work in this plant on the terms proposed by us or no one can work'. The end JUSTIFIES the means.

These people conforming normally as God-fearing law-abiding citizens have been incited by outside leadership into an emotionally charged state known as mob psychology, therefore they have not acted upon their own conscience dictated volition.''

Witnesses for defendants, mostly Union members denied practically all knowledge of the violence and denied that either the Local Union or the International Union had any part in or condoned any alleged acts of violence by any striking employees. On the contrary officials of the Local Union and the International Union testified that they repeatedly warned the strikers that they should keep themselves straight and conduct the strike in the proper manner and avoid all violence. Again we quote from the findings of the lower court:

"From the entire record, the Court finds and holds: THAT from an overwhelming preponderance of the evidence, these defendant Unions actively engaged in a concerted pattern of conduct and action which grew out of malicious intent to wrongfully interfere with the Plaintiff's business operations, its employees, suppliers, etc.

The wrongful, illegal concerted conduct and action consisted in the main of, continual harassment, abusive language, mass picketing, in function at intervals, intimidations, coercion, threats, overt threats, picketing accompanied by violence, public disorders, frightening conduct, other acts, all of which created a state of cringing fear in the area of influence of Obion County, FOUND to be in violation of the Common Law of Tennessee.

WHEREFORE, the Court holds that the Plaintiff has averred a substantial cause of action, under the Common Law, in its declaration and established same by the evidence, which gives this State Court jurisdiction.

Upon the facts proven and found in this case, this is a completed Common Law Tort Action, is COGNIZABLE in a State Court. Neither the Norris-Laguardia Act, nor the LABOR MANAGEMENT RELATIONS (TAFT-

HARTLEY) ACT, the Labor Management Reporting and Disclosure Act of 1959 (Landrum-Griffin Act of September 14, 1959), all codified in scattered sections of 29 U.S.C. or other Federal Statutes, Judicial decisions do not IMMUNIZE unions from the type of illegal activities shown in the case at bar; nor from the consequences that were a direct and proximate result of the wrongful acts of the defendants, both compensatory and punitive.

The Court holds: That this Court has the authority, the right, power and duty to hear and determine the issues in this action, to exercise jurisdiction in this case, a common law right of action for acts of force, intimidations, coercion, overt threats, violence and that the exercise of such jurisdiction herein does not conflict with any of the provisions of the 'Taft-Hartley' Act or other Federal Acts, or in any way impinge upon the rights thereby protected or prohibited, nor does the exercise of jurisdiction herein conflict with Federal Judicial Decisions, applicable to this type of case, for no opinion of the Supreme Court of the U. S. has recognized the right of a labor organization to use violent means to accomplish its end.

THE LABURNUM-RUSSELL DOCTRINE—'State power over mass picketing, threats of violence, obstruction of highways, and streets, intimidation, series of violent, malicious and unlawful acts. (Public Disorder)

United Construction Workers vs. Laburnum Construction Corporation—194 Va. 872 et seq. [75 S.E.2d 694] affirmed in 347 U.S. 656 [74 S.Ct. 833, 98 L.Ed. 1025].

'Upon substantially this same reasoning the Supreme Court of Alabama in Russell vs. International Union, etc. [258 Ala. 615], 64 So.2d. 384, upheld the right of a State Court to entertain an action for damages against a labor

union for malicious acts of violence and threats'. Affirmed in 356 U. S. 634, where the Supreme Court of U. S. reaffirmed the Laburnum Doctrine.

Common Law Tort.
Federal Level.

United Mine Workers of America vs. Meadow Creek Coal Company, 263 Federal Reporter, 2nd series page 52 et seq.; The Laburnum Doctrine accepted.

United Mine Workers vs. Osborne Mining Company, 279 Fed.2nd. 716; cert. denied 359 U.S. 1013 [364 U.S. 881, 81 S.Ct. 169, 5 L.Ed.2d 103]; [Pruitt v. Lambert], 201 Tenn. [291] 297 [298 S.W.2d 795]—cities Milk Wagon Drivers Union vs. Meadowmoor Dairies—312 U.S. 287 [61 S.Ct. 552, 85 L.Ed. 836]; picketing accompanied by violence—State Jurisdiction.

The opinion, by Justice Frankfurter, in San Diego Building Trades Council vs. Garmon, Supreme Court Reporter 79—359 U.S. 773 [359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775], cites and recognizes the Russell-Laburnum doctrine.

Justice Frankfurter, in his opinion, states that the doctrine of Federal pre-emption is inapplicable in Common Law actions which involve coercion, overt threats, violence, disorders, etc: 'That the federal occupation of the field of regulation of labor relations, affecting interstate commerce, does not extend to the State's traditional concern with the maintenance of order and protection of persons and property against violence, etc., even though such incidents are intermingled with a labor dispute'.

The State Courts may award damages that are directly and proximately chargeable to any union, growing out of overt threats, coercion, violence, etc.

The Marine Engineers, Beneficial Association vs. Inter-Lake Steamship Company,—370 U.S. 173 [82 S.Ct. 1237, 8 L.Ed.2d 418]—point involved—'Whether the supervisors were members of a certain Union'. This case is to be distinguished from the case at the bar.

The International Union strongly contends that it did not encourage, promote, participate in, authorize, condone or ratify or otherwise engage in such misconduct as to become liable through its Regional Director (Michaels), its designated Representative (Strickland), nor by its Local 1198, its officers and members. That neither the International Union nor its Local 1198 is responsible for the animus conduct action complained of in this completed tort action.

Mr. C. E. Strickland, a duly commissioned International Representative, who, during the period involved in this controversy, was almost daily present at the Union Hall or in the arterial Highway at or near the entrance to the plant and, 'Who was sent here as an Adviser and Counselor in the handling of the strike.'

Mr. Strickland participated in the negotiations as a Representative, of the International Union and in the overt functions of and during the entire period involved in the controversy whose every act was on behalf of, and benefit for his employers, each of whom accepted the fruits therefrom, Mr. Strickland made daily oral reports by telephone to his immediate superior, Mr. Michaels, of the 'events'—'an accurate report' relative to the progress and conduct of the strike. The International participated in the fixing of the date of the strike as provided in such cases by its constitution.

Mr. Strickland actively participated not only in the negotiations but also participated in campaign activities

of the Union which leadership continued throughout the period of the strike, the issuance of the injunction on January 20, 1962, and beyond. In fact, the members, the Officers of Local 1198, accepted and followed Mr. Strickland as their leader, adviser, counselor, the 'Generalissimo', the Commander-in-Chief of the entire campaign. Mr. Strickland completely controlled the emotions, will-to-act, the completed act, of the entire membership of Local 1198, including its Officers.

Where the Court (See McDaniel vs. Textile Workers Union of America, 36 Tennessee Appeals 236 [254 S.W.2d 1]) held in effect: 'That circumstantial evidence should be used in this type of case.'

It would be UNREALISTIC to believe that Mr. Strickland, a paid International Representative, who had the daily progress report containing the facts relative to the activities of the Union Members, its local officers, that he did not fully recite the true facts to his superior. In fact, Mr. Strickland insists that he furnished his superior with an accurate report on the happenings in his daily reports. (Actual notice—knowledge to superior—to Union.)

Among other things, Mr. Michaels, a Regional Director for the International Union, authorized the payment of bond premiums posted for certain members of Local 1198 who were being held on certain criminal violations growing out of this controversy.

Further, the International authorized and expended certain strike benefits, which funds were needed for the welfare of its members.

The International paid the premiums on group insurance for the benefits of its local membership after cancellation by the company. While these acts were com-

mendable, they reflect notice, knowledge of the progress of the strike.

Under all the circumstances, notice, knowledge, the Court finds that it was the duty of Mr. Michaels to act and by his inaction, silence when he should have acted, he in his official capacity, thereby acquiesced in, and condoned and ratified the illegal activities of the local membership, its officers, and more especially his International Representative, Strickland, who actively participated therein.

Mr. Bradley, the local President, Officers, Committeemen, of Local 1198, simply took their orders from Mr. Strickland and acted accordingly.

From these findings, together with a detailed examination of all the evidence, the Court is left with a definite and firm conviction, that:

From the preponderance of all the evidence, the Defendant, International Union, encouraged, promoted and authorized the strike, assisted and advised its Local, its Officers, its members, in the conduct of the strike, received notice, knowledge day by day of the activities, participated therein, acquiesced in, ratified and condoned the illegal activity, when there was ample opportunity to step in and prevent such activity, (action, Strickland, notice—knowledge of Mr. Michaels—inaction.)

Therefore, the Court finds and holds the International liable as a principal actor in these series of tortious acts, and that such affirmative conduct, inaction, when and where action was required for law and order, the said International Union did participate in, acquiesce in, condone and ratify the conduct and actions of its Regional Director, International Representative-Agent, and others.

The International Union is responsible for the conduct and action of its International Representative-Agent, its Regional Director and others under the Common Law principle of principal and agent, and its Local 1198 is responsible for its Officers, Committeemen, members.

Since, the International Union and its Local 1198 were vitally interested in and engaged in a common purpose and design, active co-participants in certain wrongful activities, the Court finds and holds : that:

These Defendants are liable jointly and severally for all the damages, if any, chargeable to these Defendants under the law and the evidence.

For propositions of law : See, Brumley vs. Chattanooga Speedway Motordrome Company, 138 Tennessee 534 [198 S.W. 775], cited with approval in United Mine Workers of America vs. Meadow Creek Coal Company, No. 263 Federal Reporter, 2nd page 52 et seq.; also in Osborne Mining Company, Inc., vs. United Mine Workers of America [United Mine Workers of America v. Osborne Mining Co.] in 279 Federal 2nd 716; United Construction Workers vs. Laburnum Construction Corporation, 194 Va. 872 [75 S.E.2d 694], confirmed by the United States Supreme Court in 347 U.S. 656 [74 S.Ct. 833, 98 L.Ed. 1025] ; UMWA v. Patton, 4 Circ., 211 F.2d 742 [47 A.L.R. 2d 850] ; 133 Tennessee 455 [181 S.W. 930, L.R.A.1916B, 391] in the McKee vs. Hughes case; cited with approval in Meadow Creek Coal. Howard vs. Haven, 198 Tennessee 572 [281 S.W.2d 480] ; Local Union 984, International Brotherhood of Teamsters, etc., vs. Humko Company, 287 Federal Reporter [2d 231] 241.

From a 'Clear' preponderance of the evidence, the International Union and Local 1198 of U.A.W., AFL-CIO are responsible for the activities which damaged Plain-

tiff, predicated upon the same material facts and reasons found to support jurisdiction. For proposition of law, see the same cases cited thereunder.''

 We concur in the finding of the Trial Court that the defendant Unions, acting by and through their representatives, Mr. Michaels and Mr. Strickland, participated in a pattern of conduct maliciously intended to interfere with plaintiff's business, to suppliers and employees by means of continual harassment, mass picketing, intimidation, coercion, threats, violence, public disorders, and frightening conduct.

It follows that assignments of error 12, 16, 17, 18, 19, 20, 21, 22 and 23 are respectfully overruled.

By assignments of error 13, 14 and 15 the defendants insist that the Trial Court was in error in permitting the witness, Leon V. Bracknis, controller for Ampco, to testify from certain summaries made by him from the books and records of the company as to the fixed annual costs of the Union City plant operation and damages sustained by the plaintiff from lost profits. The defendants contend that they were entitled to have the books and records of the company brought into court since they objected to the introduction of summaries from which Mr. Bracknis testified on the grounds of the best evidence rule.

Mr. Bracknis set the total annual fixed costs for the Union City plant at $1,208,482.26 which the Trial Court divided by 246 normal production days to establish a daily fixed cost of $4,912.53. Ampco has total sales of more than $150,000,000.00 per year. Mr. Bracknis, as controller of the company, has charge of all accounting records. Ampco operates several divisions and plants. It

would have been very cumbersome for all of the records of the company from which the daily fixed costs were determined to have been brought into court in Union City.

Prior to trial the deposition of Mr. Bracknis was taken by defendants in Detroit and two certified public accountants employed by defendants were present at the time the deposition was taken. These accountants were permitted to visit plaintiff's main office in Detroit and given access to all the corporate records from which Mr. Bracknis made his summaries and computation of annual fixed costs. The defendants offered no proof tending to show that the annual fixed cost of the Union City plant as arrived at by Mr. Bracknis was erroneous. Just before the conclusion of the trial in the present case when the question of the admissibility of the summaries which Mr. Bracknis had prepared and from which he testified were being discussed attorneys for the plaintiffs agreed to bring Mr. Bracknis back before the court together with any books or records which the defendants might desire in order that they might further cross examine relative to such records of the company.

The defendants made no criticism of any portion of Mr. Bracknis' summaries and gave the court no suggestion of which particular record or records of the company their accountants had not seen and they did not make any request for additional cross-examination of Mr. Bracknis nor to see any additional records. Under these circumstances the rights of the defendants were fully protected even though the enforcement of the best evidence rule was relaxed. The action of the Trial Court was in line with the rule laid down in 20 Am.Jur. on Evidence, page 398:

"5. Voluminous or Complicated Character of Writings

"Sec. 449. Generally.—The rule rejecting secondary evidence of a writing is made subject to an exception in some jurisdictions where the originals consist of numerous accounts or other documents which cannot be examined in court without great loss of time and where the evidence sought from them is only the general result of the whole. It is proper for the witness in such case to render a summary based on an inspection of a number of such documents or, where practical, all of them. The admission of proof of this character is not a violation of the parol evidence rule, but a relaxation thereof, demanded by the exigencies of the case. Thus, a witness' summary of documents is useful to show the amount or volume of business transacted or the financial condition of a firm. Similarly, such testimony is admissible to show embezzlement or misappropriation of funds, insolvency, money received, work performed, the state of accounts, or any situation where the exigencies of the case impel such practice in the interests of justice. The testimony of an accountant or auditor is frequently admitted in cases of this character, where he has examined the documents or books involved and is able to testify as to their contents. But it is clear that any summary rendered by such a witness must be confined to the facts or data that came within his observation and must exclude the witness' own conclusions or inferences. Where the books or documents before the court are not voluminous or so complicated as to require a clarification or a summary by an expert or otherwise qualified witness, secondary evidence of their contents is inadmissible. To

render a summary of voluminous records prepared by an expert admissible in evidence, the competency of the records themselves as evidence must have been established and the records must further be made available to the opposite party for the purpose of cross-examination."

Assignments of error 13, 14 and 15 are therefore respectfully overruled.

Assignments of error 24 and 25 insist that the lower court was without jurisdiction to award damages for two reasons: (1) Since plaintiff's alleged damages arose out of a strike the entire field of litigation was preempted by the Taft-Hartley Act; that the National Labor Relations Board had exclusive jurisdiction of the controversy and that the case of United Construction Workers et al. v. Laburnum Construction Corp., 1954, 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025, was no longer applicable; (2) that even if the rule announced in the Laburnum case is still in force there was no such violent illegal conduct present in the case at bar as was present in the Laburnum Construction Corporation case.

With reference to part (1) defendants cite and rely primarily upon the case of San Diego Building Trades Council v. Garmon, 1959, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775, and the recent case of Retail Clerks International Association Local 1625 v. Schermerhorn, 375 U.S. 96, 84 S.Ct. 219, 11 L.Ed.2d 179. In the Garmon case an employer recovered judgment in the California court against the defendant Unions for damages arising out of illegal picketing. The Supreme Court of the United States reversed the action of the state court and held that the exclusive jurisdiction was with the National Labor Relations Board. The court predicated its decision upon the

fact that the adjudication in the California court was based upon the assumption that the illegal picketing by the defendant Unions constituted an unfair labor practice which was subject to the exclusive jurisdiction of the National Labor Relations Board. From said opinion we quote as follows:

"When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by sec. 7 of the National Labor Relations Act, or constitute an unfair labor practice under sec. 8, due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law. Nor has it mattered whether the States have acted through laws of broad general application rather than laws specifically directed towards the governance of industrial relations. Regardless of the mode adopted, to allow the States to control conduct which is the subject of national regulation would create potential frustration of national purposes.

"At times it has not been clear whether the particular activity regulated by the States was governed by sec. 7 or sec. 8 or was, perhaps, outside both these sections. But courts are not primary tribunals to adjudicate such issues. It is essential to the administration of the Act that these determinations be left in the first instance to the National Labor Relations Board. What is outside the scope of this Court's authority cannot remain within a State's power and state jurisdiction too must yield to the exclusive primary competence of the Board. See,

e. g., Garner v. Teamsters, etc. Union, 346 U.S. 485, especially at pages 489-491, 74 S.Ct. 161, at pages 165-166, 98 L.Ed. 228; Weber v. Anheuser-Busch, Inc., 348 U.S. 468, 75 S.Ct. 480, 99 L.Ed. 546.

\* \* \* \* \* \*

"When an activity is arguably subject to sec. 7 or sec. 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted."

However, the court expressly differentiated the facts in the Garmon case from the Laburnum case as shown by the following concluding paragraph of the majority opinion in the Garmon case:

"It is true that we have allowed the States to grant compensation for the consequences, as defined by the traditional law of torts, of conduct marked by violence and imminent threats to the public order. International Union, United Automobile, Aircraft and Agricultural Implement Workers, etc. v. Russell, 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030; United Construction Workers, etc. v. Laburnum Const. Corp., 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025. We have also allowed the States to enjoin such conduct. Youngdahl v. Rainfair, Inc., 355 U.S. 131, 78 S.Ct. 206, 2 L.Ed.2d 151; United Automobile, Aircraft and Agricultural Implement Workers, etc. v. Wisconsin Employment Relations Board, 351 U.S. 266, 76 S.Ct. 794, 100 L.Ed. 1162. State jurisdiction has prevailed in these situations because the compelling state interest, in the scheme of our federalism, in the maintenance of domestic peace is not overridden in the absence of clearly expressed congressional direction. We recognize that the opinion in

United Construction Workers, etc. v. Laburnum Const. Corp., 347 U.S. 656, 74 S.Ct. 833, 835, 98 L.Ed. 1025, found support in the fact that the state remedy had no federal counterpart. But that decision was determined, as is demonstrated by the question to which review was restricted, by the 'type of conduct' involved, i. e., 'intimidation and threats of violence.' In the present case there is no such compelling state interest.

"The judgment below is reversed."

Retail Clerks International v. Schermerhorn, supra, cited and relied upon by solicitors for defendants involved a suit by a non-union employee to have an agency shop contract declared illegal. The employer and the union had contracted that any employees covered by the contract who chose not to join the union were required to pay as a condition of employment an initial service fee and monthly service fees to the union. The Florida State Supreme Court held that this contract violated the "right to work" provision of the Florida constitution and that the Florida state courts had jurisdiction to afford a remedy. The United States Supreme Court differentiated the Garmon case and upheld the jurisdiction of the Florida state court.

 In our opinion the Circuit Court of Obion County had jurisdiction to award damages against the defendants under the authority of United Construction Workers et al. v. Laburnum Construction Corp., 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025, and the case of International Union, etc., UAW-CIO v. Russell, 1958, 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030.

In the Laburnum case the defendant Union by means of intimidation and threats of violence prevented an employer from using its regular employees and forced it to

abandon a construction contract with consequent loss of profits. The employer filed a tort action in a Virginia court and recovered a judgment for $40,000.00 compensatory damages and $100,000.00 punitive damages. The United States Supreme Court granted certiorari but held that even though the conduct of the Union constituted an unfair labor practice and a violation of Section 8(b) (1) (a) of the Taft-Hartley Act the state court had jurisdiction of the tort proceeding. The court, speaking through Mr. Justice Burton, noted that "Here Congress has neither provided nor suggested any substitute for the traditional state court procedure for collecting damages for injuries caused by tortious conduct. For us to cut off the injured respondent from this right of recovery will deprive it of its property without recourse or compensation. To do so will, in effect, grant petitioners immunity from liability for their tortious conduct. We see no substantial reason for reaching such a result. The contrary view is consistent with the language of the Act and there is positive support for it in our decisions and in the legislative history of the Act. * * * If Virginia is denied jurisdiction in this case, it will mean that where the federal preventive administrative procedures are impotent or inadequate, the offenders, by coercion of the type found here, may destroy property without liability for the damage done. If petitioners were unorganized private persons, conducting themselves as petitioner did here, Virginia would have had undoubted jurisdiction of this action against them. The fact that petitioners are labor organizations, with no contractual relationship with respondent or its employees, provides no reasonable basis for a different conclusion. The jurisdiction of the Supreme Court of Appeals of Virginia is, therefore, sustained and its judgment affirmed."

In International Union UAW-CIO v. Russell, supra, an Alabama state court had awarded a plaintiff employee a judgment of $10,000.00 which included punitive damages against the International Union and its agent. The Union called a strike and began mass picketing in such a manner as to close substantially the entrance to the plant where plaintiff Russell worked. The pickets by force of numbers and threats of bodily harm to Russell and of damage to his automobile prevented him from getting into the plant and he missed work from July 18 until August 22, 1951. Though they threatened to overturn his automobile they never did. Russell brought suit in tort claiming mental anguish, loss of earnings and punitive damages. After the Alabama Supreme Court affirmed the judgment the United States Supreme Court granted certiorari. Mr. Justice Burton re-announced approval of the opinion in the Laburnum case, denied the contention of the Union that the NLRB had exclusive jurisdiction and affirmed the judgment. Mr. Justice Burton stated that jurisdiction was not preempted by the Taft-Hartley Act even though NLRB had authority to award back pay. From his opinion we quote as follows:

"The situation may be illustrated by supposing, in the instant case, that Russell's car had been turned over resulting in damage to the car and personal injury to him. Under state law presumably he could have recovered for medical expenses, pain and suffering and property damages. Such items of recovery are beyond the scope of present Board remedial orders. Following the reasoning adopted by us in the Laburnum case, we believe that state jurisdiction to award damages for these items is not pre-empted. Cf. International Ass'n of Machinists v. Gonzales, 356 U.S. 617, 78 S.Ct. 923.

Nor can we see any difference, significant for present purposes, between tort damages to recover medical expenses and tort damages to recover lost wages. We conclude that an employee's right to recover, in the state courts, all damages caused him by this kind of tortious conduct cannot fairly be said to be preempted without a clearer declaration of congressional policy than we find here. Of course, Russell could not collect duplicate compensation for lost pay from the state courts and the Board.

"Punitive damages constitute a well-settled form of relief under the law of Alabama when there is a willful and malicious wrong. Penney v. Warren, 217 Ala. 120, 115 So. 16. To the extent that such relief is penal in its nature, it is all the more clearly not granted to the Board by the Federal Acts. Republic Steel Corp. v. National Labor Relations Board, 311 U.S. 7, 10-12, 61 S.Ct. 77, 78-79, 85 L.Ed. 6. The power to impose punitive sanctions is within the jurisdiction of the state courts but not within that of the Board. In Laburnum we approved a judgment that included $100,000 in punitive damages. For the exercise of the police power of a State over such a case as this, see also, Youngdahl v. Rainfair, Inc., 355 U.S. 131, 78 S.Ct. 206, 2 L.Ed.2d 151; Auto, Aircraft and Agr. Implement Workers v. Wisconsin Employment Relations Board, 351 U.S. 266, 274, note 12, 76 S.Ct. 794, 799, 100 L.Ed. 1162.

"Accordingly, the judgment of the Supreme Court of Alabama is affirmed."

Solicitors for defendant Unions have cited many, many other cases involving labor unions but since we have determined that the lower court had jurisdiction under the Laburnum and Russell cases, supra, we deem it un-

necessary to discuss and differentiate the other cases cited and relied upon by appellants.

We find no merit in defendants' insistence that the alleged violent misconduct in the present case was not of such character or sufficiency to allow the lower court jurisdiction. In addition to physically blocking the entrance to the plant there was proof that the company automobile was parked in the driveway of Mr. Luther, the plant manager, on Christmas night and a shotgun was fired into the back end of the car. The next morning as he approached the plant, pickets were hollering, "Bang, Bang." The automobile of Cartwright, a foreman at the plant, was turned over in the street by a mob of strikers and pickets. The car of another foreman had the radio aerial pulled off. Large numbers of roofing nails were placed in the plant entrance. Tires of non-union employees were slashed. Non-union employees were followed and threatened with bodily injury. Rocks were thrown at the automobiles of non-union employees. The home in Union City, Tennessee, in which a non-union employee had an apartment was dynamited. It is true that some of the violence followed reopening of the plant but non-union people were working in the plant. The union members resented their presence there. These activities reveal a clear pattern of conduct on the part of the striking union members to win their strike by violence and fear. The defendant Unions, both International and Local, not only acquiesced in such violence but the International Union gave the strikers moral and financial support in the form of strike benefits. The total of these benefits during the entire period of the strike amounted to $315,000.00. These benefits consisted not only of weekly support payments but also funds with which to pay mortgage payments on their homes, insurance payments, etc. No effort was made

by the International Union to stop the violence on the part of the striking members except to admonish them in the meeting hall that there should be no violence. Assignments of error 24 and 25 are therefore overruled.

Assignment of error No. 28 insists that the court was in error in determining plaintiff's compensatory damages to be $68,775.42 based on the daily fixed cost formula. In arriving at the annual fixed cost for the Tennessee plant the controller, Mr. Bracknis, added to the local expenses such as salaries, labor, utilities, etc. 18.93% of certain overall expenses incurred in the general office in Detroit such as selling expense, general and administrative expense and research expense. The allocation factor of 18.93 represents the percentage of total sales of the company which come from Union City production. The solicitors for defendants complain of this method of arriving at the annual fixed cost but they offer no suggestion of any other method of arriving at such figure. In our opinion the formula used was fair and as reasonably accurate as could be obtained under all the circumstances. For this reason assignment of error No. 28 is respectfully overruled.

Assignments of error Nos. 26 and 27 insist that plaintiff's plant was closed from January 3, 1962, through January 20, 1962, because of the existence of a legal strike and not because of any illegal or wrongful concerted activities on the part of the defendants; that the plaintiff had no work force with which to operate its plant during this period of time and did not determine to reopen the plant with non-union labor until January 17, 1962. These assignments of error must be sustained in part.

The defendants called a strike for November 14, 1961. On January 2, 1962, Mr. William Barter, director of per-

sonnel, informed the Union through a federal mediator that if the strike was not settled the company would hire replacements. The news came to members of the Union that the company expected to replace the strikers with female whites and both male and female negroes. The strikers were very resentful over this news and large numbers appeared daily before the entrance to plaintiff's plant almost completely blocking ingress and egress. However, the plaintiff company did not publicly announce that it would receive applications for employment until January 16, 1962, when it issued a press release to the Union City Daily Messenger that beginning the next morning it would accept persons for permanent employment between the ages of 18 and 50 with the starting wage of $1.50 per hour for female employees and $1.75 per hour for male employees. We quote from the release as follows:

"The Union City plant of American Metal Products Co., has been on strike for more than nine weeks, and the company feels that the time has arrived when it should be determined whether or not there are people in this area who desire to work in that plant."

On the next day, January 17, an unusually large and violent group of strikers appeared in front of the plant and prevented applicants for employment from entering the plant. An automobile driven by one applicant was seized and pushed and shoved by the strikers up the street. Because of the increased harassment and interference and threats of serious violence all employees of the plaintiff were told to remain at home on January 19. On January 20, 1962, the plaintiff obtained an injunction from the Chancery Court of Obion County prohibiting the mass picketing and unlawful activities at the gates of the

plaintiff's plant. The strikers respected the injunction. New employees began reporting for work on January 22, 1962. By January 29, the plaintiff had recruited its full complement of 388 production employees.

Thus it appears that plaintiff's plant was closed because of the strike from November 14, 1961, until January 16, 1962, and that the plaintiff is not entitled to recover losses resulting from the exercise by the defendant Unions of their lawful right to strike. Rowe Transfer & Storage Co. v. International Brotherhood, 186 Tenn. 265, 209 S.W.2d 35.

It does appear that on January 17, 1962, the plaintiff company was ready and willing to accept new employees but was prevented from so doing because of the physical violence and threats of the strikers for which we have held these defendants legally responsible. After the injunction was obtained on January 20, 1962, the new employees began reporting for work on January 22, 1962. January 21, 1962 was on a Sunday. We hold that the plaintiff's plant was kept closed and out of production by defendants' activities for the four days, Wednesday, January 17, Thursday, January 18, Friday, January 19, and Saturday, January 20, 1962. Therefore, the judgment of the lower court awarding the plaintiff compensation for fourteen production days at the rate of $4,912.53 is reduced to four days and compensatory damages set at $19,650.12. Plaintiff made no proof of the amount of damages sustained to its physical properties such as the shooting of the automobile.

Assignments of error Nos. 29 and 30 insist that the Court below was in error in allowing punitive or exemplary damages. The allowance of punitive damages in tort cases is firmly established in Tennessee where the

acts are done maliciously. McDonald v. Stone, 45 Tenn. App. 172, 321 S.W.2d 845. Punitive damages are intended to impose a punishment on the defendant for his conduct and hold him up as an example to the community. Herstein v. Kemker, 19 Tenn.App. 681, 94 S.W.2d 76. In Suzore v. Rutherford, 1952, 35 Tenn.App. 678, 251 S.W.2d 129, this court upheld punitive damages of $10,000.00 where the plaintiff had been awarded $4,000.00 in actual damages.

In the case at bar the record fully supports the finding of the lower court that the defendant Unions acted oppressively and maliciously toward the plaintiff with the avowed purpose of bringing the plaintiff to its knees, figuratively speaking, and making it yield to defendants' demands. We affirm the assessment of $50,000 punitive damages and overrule assignments of error 29 and 30.

Assignment of error No. 31 insists that it was error for the court to permit the plaintiff to introduce exhibit C to the testimony of C. E. Strickland, International Union representative, which exhibit C disclosed the wealth of defendant International Union but did not contain any reference to the wealth of defendant Local Union. Exhibit C was Vol. 5, No. 3, dated March, 1962, of the UAW newspaper entitled "Solidarity." This edition was printed especially for members of Regions 3, 5 and 8 of the International Union. The publication is approximately 17″ x 11½″ in size, contains eight pages of news items both concerning the national union and activities of various local unions and also contains eight pages of financial records and reports of the affairs of the International Union.

Apparently these newspapers are sent regularly to the members of the International Union. The one introduced

in evidence bore the following address: "1198 Ben P. Norrid, RFD 4, Union City Tenn." The financial report of the Secretary-Treasurer showed that the International Union had cash assets as of December 31, 1961, of $57,-284,000.00 free of debt. It also listed Local No. 1198 employed by American Metal Products Company as having received $70,588.00 in strike assistance benefits for the period January 1, 1961, through December 31, 1961. The local went on strike November 13, 1961.

The newspaper also carried a news article which stated that Region 8 Director E. T. Michaels had requested all local unions in Region 8 to assist members of Local 1198 against "a run away employer determined to bust their Union." The news article also contained a summary of charges against Ampco as having followed a deliberate practice of trying to bust the Union since it was first unionized in 1953. The news item also contained a statement by Mr. Michaels that the UAW was fighting back in every possible way.

Appellants cite and rely upon the case of Washington Gaslight Co. v. Lansden, 1899, 172 U.S. 534, 19 S.Ct. 296, 43 L.Ed. 543. From that case we copy the following headnote:

"Evidence of the wealth of one of the defendants in a libel case, offered as bearing on the allowance of exemplary damages, is inadmissible in a case when the verdict must be for one entire sum against all the defendants found guilty, and might be collected from any one of them, who would have no right of contribution."

That case went to the U. S. Supreme Court from the District of Columbia. We are cited to no Tennessee case relating to this question. However, it is our opinion

that the Washington Gaslight case is not controlling of the case at bar for two reasons: (1) The contents of the newspaper were admissible as tending to show that the International Union not only had full knowledge of the strike but was financially assisting the members of Local 1198 during the strike and also called upon other locals to give both financial and moral support to their efforts. There was no suggestion that the newspaper was offered solely for the purpose of showing the net worth of the International Union. The objection to the admissibility of the newspaper was made by counsel for appellants upon the taking of the deposition. Objection was made to the admissibility of the entire newspaper and not to any portion thereof. No grounds for the objection were stated.

(2) Nowhere in the assignments of error or brief of the appellants is the court cited to the page of the record where the objection to the evidence was made upon the reading of the deposition to the court and no reference is made to the page or pages of the record where the ruling of the court below was made on the admissibility of such evidence. This citation is required by Rule 11, sub-paragraph (2), of this court. For these reasons we think the assignment of error is without merit and it is respectfully overruled.

Therefore, the judgment of the lower court will be modified so as to award the plaintiff, American Metal Products Company, a judgment against the defendants, International Union and Local 1198, in the amount of $64,737.59, which includes compensatory damages of $14,737.59 and punitive damages of $50,000.00 together with interest from June 14, 1963. The appellants will be taxed with the costs in this court and in the court below.

Avery, P.J.(W.S.) and Bejach, J., concur.